UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 18-CV-62106-BLOOM/VALLE

PIA GAGLIARDI,

Plaintiff,

v.

SOCIAL SECURITY ADMINISTRATION,

Defendant.
_______________________________/

**REPORT AND RECOMMENDATION TO DISTRICT JUDGE**

THIS MATTER is before the Court upon Defendant's Motion for Summary Judgment (ECF No. 23) and Plaintiff's Motion to Declare Social Security Administration Administrative Law Judges Unconstitutional as Violating the Appointments Clause and Remand for New Administrative Hearing. (ECF No. 30) (together, the "Motions"). United States District Judge Beth Bloom has referred the Motions to the undersigned for a Report and Recommendation. (ECF No. 5); *see also* 28 U.S.C. § 636(c).

After due consideration of the record and the parties' briefs, including the parties' respective Responses to the Motions (ECF Nos. 31 and 33), Plaintiff's Reply (ECF No. 32), and Plaintiff's Notice of Supplemental Authority (ECF No. 34), and being otherwise fully advised on the matter, the undersigned respectfully recommends that: (i) Defendant's Motion for Summary Judgment (ECF No. 23) be **GRANTED**; (ii) Plaintiff's Motion to Declare Social Security Administration Administrative Law Judges Unconstitutional as Violating the Appointments Clause and Remand for New Administrative Hearing (ECF No. 30) be **DENIED**; and (iii) the

Administrative Law Judge's Decision ("ALJ's Decision") be **AFFIRMED** for the reasons set forth below.

## I. PROCEDURAL HISTORY

On January 13, 2015, Plaintiff Pia Gagliardi ("Plaintiff" or "Claimant") applied for supplemental security income under the Social Security Act (the "Act"), 42 U.S.C § 401 *et seq*., alleging a disability onset date of January 1, 2008. (R. 189-90).[1] Her claims were denied initially and again upon reconsideration. (R. 127, 133). Thereafter, Claimant requested a hearing, which was held before ALJ Valencia Jarvis on May 5, 2017. (R. 139-41, 156-68). Claimant, appearing with counsel, testified at the hearing. (R. 55-86). A Vocational Expert also testified. (R. 86-89). On September 26, 2017, the ALJ issued a decision denying Claimant's applications and finding that Claimant was not disabled within the meaning of the Act. (R. 10-30).

Thereafter, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's Decision the Commissioner's "final decision." (R. 1-5); *see Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). Plaintiff now seeks judicial review of the ALJ's Decision. (ECF No. 1); *see also* 42 U.S.C. § 405(g). Both parties have moved for summary judgment, and the Motions are ripe for adjudication.

## II. STANDARD OF REVIEW

Judicial review of the ALJ's Decision is limited to whether there is substantial evidence in the record as a whole to support the ALJ's finding and whether the ALJ applied the correct legal standards in making her determination. *Carson v. Comm'r of Soc. Sec.*, 440 F. App'x 863, 864 (11th Cir. 2011) (citations omitted); *see also* 42 U.S.C. § 405(g). "Substantial evidence is more

[1] All references are to the record of the administrative proceeding filed as part of Defendant's Answer. *See* (ECF Nos. 17 and 18).

than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Carson*, 440 F. App'x at 864 (quoting *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004)); *accord Hale v. Bowen*, 831 F.2d 1007, 1011 (11th Cir. 1987) (holding that substantial evidence is "more than a scintilla, but less than a preponderance") (quoting *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)). A court, however, "may not decide the facts anew, reweigh the evidence, or substitute [its] judgment for that of the [ALJ]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (quoting *Phillips v. Barnhart*, 357 F.3d 1232, 1240 n.8 (11th Cir. 2004)). Even if evidence preponderates against the ALJ's Decision, a court must affirm "if the decision is supported by substantial evidence." *Bloodsworth*, 703 F.2d at 1239 (citing 42 U.S.C. § 405(g)). Within this narrow role, however, courts do not act as automatons. *MacGregor v. Bowen*, 786 F.2d 1050, 1053 (11th Cir. 1986). Rather, they "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (citing *Bloodsworth*, 703 F.2d at 1239).

To qualify for benefits, a claimant must be disabled within the meaning of the Act. *See* 42 U.S.C. § 1382 (standard for supplemental security income benefits). A claimant is disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A). A "physical or mental impairment" is one that "results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 1382c(a)(3)(D).

To determine eligibility, the ALJ employs a five-step sequential evaluation:

(1) Is the person presently unemployed?
(2) Is the person's impairment severe?

(3) Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Part 404, Subpart. P, Appendix 1 (the "Listings")?
(4) Is the person unable to perform his or her former occupation?
(5) Is the person unable to perform any other work within the economy?

20 C.F.R. § 416.920(a)(4) (evaluation process for supplemental security income benefits). An affirmative answer to any of the above questions leads either to the next question or, on Steps 3 and 5, to a finding of disability. *McDaniel v. Bowen*, 800 F.2d 1026, 1030 (11th Cir. 1986). A negative answer to any question, other than Step 3, leads to a determination of "not disabled." *Id.*

Importantly, the burden of proof rests on the claimant through Step 4. *Phillips*, 357 F.3d at 1241 n.10. At Step 4, the ALJ must consider: (i) the claimant's residual functional capacity ("RFC"); and (ii) the claimant's ability to return to her past relevant work. 20 C.F.R. § 416.920(a)(4)(iv). The regulations define RFC as that which an individual is still able to do despite the limitations caused by her impairments. 20 C.F.R. § 416.945(a). The ALJ will "assess and make a finding about [the claimant's RFC] on all the relevant medical and other evidence" in the case. 20 C.F.R. § 416.920(e). The RFC assessment is used to determine whether the claimant can return to her past relevant work under Step 4, and if so, "the ALJ will conclude that the claimant is not disabled." *Phillips*, 357 F.3d at 1238 (citations omitted). If a claimant cannot return to her past relevant work, then the ALJ proceeds to Step 5. *Id.*

At Step 5, the ALJ considers the claimant's RFC, age, education, and work experience to determine whether the claimant "can make an adjustment to other work." 20 C.F.R. § 416.920(a)(4)(v); *Phillips*, 357 F.3d at 1239 (citation omitted). The ALJ must determine if there is other work available in significant numbers in the national economy that the claimant has the ability to perform. *Phillips*, 357 F.3d at 1239. If the claimant can make the adjustment to other work, the ALJ will determine that the claimant is not disabled. *Id.* Conversely, if the claimant

cannot make the adjustment to other work, the ALJ will determine that the claimant is disabled. *Id.* The ALJ may determine whether the claimant has the ability to adjust to other work in the national economy by either: (1) applying the Medical Vocational Guidelines (contained within 20 C.F.R. part 404, subpart P, appendix 2); or (2) using a Vocational Expert, who can opine on whether someone with the claimant's limitations can obtain employment in the national economy. *Id.* at 1239-40.

## III. THE HEARING RECORD[2]

### A. Claimant's Background and Hearing Testimony

Plaintiff was 41 years old at the administrative hearing and at the time of the ALJ's Decision. (R. 55). She is a college graduate with a bachelor's degree in psychology and last worked as a substitute teacher approximately 50 times over a four-year period. (R. 56, 57). Plaintiff has also worked as a post office clerk and claims adjuster. (R. 58-59). Plaintiff testified that she has trouble keeping jobs and that all her jobs have lasted under six months because she was "very depressed," had a lot of anxiety, and did not get along with people. (R. 60, 61). According to Plaintiff, she was fired from some jobs and left others due to her depression and anxiety. *Id*.

Plaintiff testified that, although she does not get along with her family, she has lived with her sister for years. (R. 63, 80-81). Plaintiff does not speak to her father, who was verbally abusive, nor to her brother since she had an argument with him and his wife approximately four years ago. (R. 81-82). Plaintiff and her sister occasionally visit their homebound mother who lives in Delray, Florida. (R. 84).

[2] The medical evidence is discussed as relevant to the parties' arguments. *See infra* Section V.C.

Regarding activities of daily living, Plaintiff testified that she lets her sister's dog into the backyard and watches TV and animated movies for approximately six hours a day. (R. 83). Plaintiff cannot do much housework. (R. 65). When she tries to wash dishes, her pain worsens and sometimes she throws out her back. (R. 84-85). She walks to the corner when she feels up to it and, approximately once a week, will "throw in a load of laundry" to wash, but her sister takes it out and sorts it. (R. 85-86).

Regarding her mental limitations, Plaintiff testified that she becomes instantly depressed as soon as she wakes up. (R. 66). She noted that she has negative thoughts. (R. 65, 66). According to Plaintiff, she has had suicidal thoughts and, in her early 20s, was Baker Acted for cutting herself. (R. 66). Although she continues to cut herself, she reportedly cuts where people cannot see. (R. 67). Plaintiff also testified that she has panic attacks a couple of times a week. *Id*.

With regard to her physical condition, Plaintiff testified that she receives treatment for herniations and bulging discs, stenosis, and back and neck pain. (R. 70). Plaintiff takes several medications, including muscle relaxers, pain killers, oxycodone, morphine and Xanax. *Id*.

**B. Vocational Expert's Testimony**

The Vocational Expert testified that Claimant's past relevant work included work as claims adjuster (light work with an SVP of 6), post office clerk (light work with an SVP of 4), and teacher (light work with an SVP of 7). (R. 87).

The ALJ questioned the Vocational Expert about a hypothetical individual of Claimant's age, education, and previous work experience who could: lift and carry 20 pounds occasionally and 10 pounds frequently; stand, walk and/or sit for six hours in an eight-hour day; perform unlimited pushing and pulling; frequently climb ramps, stairs, ladders, and scaffolds; perform unlimited balancing, but occasional stoop; and frequently kneel, crouch, and crawl; understand,

remember, and carry out short, simple work instructions and occasionally interact with the public and coworkers. (R. 88). According to the Vocational Expert, such an individual could not perform Claimant's past relevant work, which was semiskilled to skilled, and exceeded Claimant's restriction on remembering and carrying out short, simple instructions. *Id*.

Nevertheless, the Vocational Expert testified that the hypothetical individual could perform other jobs in the national economy. Specifically, the Vocational Expert testified that Claimant could work as an electronics worker, small product assembler, and mail sorter (all light, unskilled jobs with an SVP of 2). *Id*.

## IV. THE ALJ'S DECISION

After reviewing the evidence and conducting the requisite five-step analysis, the ALJ concluded that Claimant "has not been under a disability within the meaning of the Social Security Act since December 30, 2014," the date the application was filed.[3] (R. 10).

At Step 1, the ALJ determined that Claimant has not engaged in substantial gainful activity since December 30, 2014, the purported application date. (R. 12).

At Step 2, the ALJ found that Claimant had the following severe impairments: obesity; disc herniation lumbar and cervical spine; depression not otherwise specified; anxiety disorder not otherwise specified; bipolar disorder; and attention deficit hyperactivity disorder. *Id*. The ALJ also found that Claimant's bilateral carpal tunnel syndrome, asthma, and high cholesterol were not severe impairments. (R. 13-14).

At Step 3, the ALJ concluded that Claimant did not have an impairment or combination of impairments that meets or medically equal the severity of one of the Listings. (R. 14).

[3] The ALJ Decision refers to an application date of December 30, 2014, but the record confirms that the application was filed on January 13, 2015. *Compare* (R. 10) *with* (R. 189).

At Step 4, the ALJ determined that Claimant had the residual functional capacity to perform light work as follows: the claimant can lift and/or carry 20 pounds occasionally and 10 pounds frequently; can sit, stand, or walk for 6 hours in an 8-hour workday; can perform unlimited pushing and/or pulling; can frequently climb ramps, stairs, ladders, and scaffolds, without limitation on her ability to balance; can occasionally stoop, and can frequently kneel, crouch, and crawl; is able to understand, remember, and carry out short, simple work instructions and occasionally interact with the public and co-workers. (R. 16).

In reaching this conclusion at Step 4, the ALJ considered Claimant's symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, as well as opinion evidence. *Id*. Although the ALJ found that Claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms, the ALJ concluded that Claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. (R. 18). Nevertheless, the ALJ determined that Claimant was unable to perform her past relevant work because it exceeded Claimant's RFC. (R. 28). Accordingly, the ALJ proceeded to Step 5 of the evaluation process. (R. 29).

At Step 5, the ALJ concluded that considering the Claimant's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Claimant can perform despite her limitations. *Id*. Specifically, the ALJ accepted the Vocational Expert's testimony that Claimant could work as an electronics worker, small product assembler, or mail sorter. *Id*.

## V. DISCUSSION

Plaintiff raises four arguments on appeal. *See generally* (ECF Nos. 30 and 33). First, in response to Defendant's Motion for Summary Judgment on the merits, Plaintiff argues that the ALJ improperly discounted Plaintiff's testimony about the severity of her symptoms, including Plaintiff's allegations of pain and her mental health condition. *See* (ECF No. 33 at 6-10). Plaintiff next argues that the ALJ improperly discounted the opinion of Plaintiff's treating physicians (Drs. Mark Barnett and Moises Issa), while giving too much weight to the State Agency consultants (Drs. Candice Mihm, Yamir Laboy, and Lisa Mungul). *Id.* at 12-15. Plaintiff also asserts that the ALJ erred when relying on the opinion of the Vocational Expert because there was no explanation of how Plaintiff's cumulative limitations restricted her ability to perform the identified jobs. *Id.* at 15-17.

Lastly, Plaintiff presents a legal challenge to the ALJ's Decision based on the 2018 Supreme Court decision *Lucia v. SEC*, 1138 S. Ct. 2044 (2018). Plaintiff argues that *Lucia* requires remand so this case can be tried by an ALJ who has been appointed in a constitutionally compliant manner under the Constitution's Appointments Clause. *See generally* (ECF No. 30).

### A. Claimant's Appointments Clause Challenge is Untimely[4]

Pursuant to the Appointments Clause of the United States Constitution, "Officers of the United States" may be appointed only by the President, "Courts of Law," or "Heads of Departments." U.S. CONST. Art. II., § 2, cl. 2; *see also Lucia*, 1138 S. Ct. at 2050. In *Lucia*, the Supreme Court addressed an Appointments Clause challenge to an ALJ appointed by the Securities and Exchange Commission (an "SEC ALJ"). *Lucia*, 1138 S. Ct. at 2049-50. The SEC had charged

[4] Because this is a purely legal and procedural argument, the undersigned will address it first.

Lucia with misleading investors in connection with the sale of retirement investment products. *Id.* at 2050. The SEC ALJ ruled that Lucia's products were, in fact, misleading, required him to pay substantial fines, and permanently banned him from working in the investment industry. *Id.* Lucia appealed the ALJ's decision to the SEC, arguing that the ALJ had not been properly appointed under the Appointments Clause. *Id.* Lucia then sued in federal court, challenging the penalties imposed by the SEC ALJ, and making the same Appointments Clause argument previously raised before the SEC. *Id.* The D.C. Circuit Court of Appeals denied the challenge, but after the Supreme Court granted certiorari, it reversed the decision and remanded the case, finding that Lucia's agency appeal should be heard by a different ALJ who had been properly appointed under the Appointments Clause. *Id*. at 2055.

The Supreme Court in *Lucia* did not specifically address the constitutionality of the appointment of ALJs working for other federal agencies, including the Social Security Administration ("SSA"). Nonetheless, following *Lucia*, many Social Security claimants have challenged the status of SSA ALJs under the Appointments Clause. *See generally* (ECF No. 31 at 5-7) (compiling post-*Lucia* cases). Like those litigants, Claimant here argues that *Lucia* applies to SSA ALJs, requiring this Court to vacate the current ALJ's Decision and remand the case to a different ALJ appointed in accordance with the Appointments Clause. *See* (ECF No. 30 at 17). In response, the Commissioner argues that Claimant's argument is untimely in that she failed to raise the Appointments Clause challenge during the administrative process, thereby forfeiting this argument. *See generally* (ECF No. 31).

Having reviewed the facts of this case and the plethora of post-*Lucia* cases on this issue, the undersigned agrees with the Commissioner that Plaintiff has forfeited her Appointments Clause

challenge by failing to argue the issue during the administrative proceedings.[5] *See, e.g.*, *Perez v. Berryhill*, No. 18-20760-CV, 2019 WL 1405642, at *4 (S.D. Fla. Mar. 28, 2019) (rejecting as untimely claimant's Appointments Clause argument raised for the first time before the court); *see also* (ECF No. 31 at 5-7) (Commissioner's response containing compilation of cases on the timeliness of Appointments Clause claims and noting that "34 out of 35 district courts that have decided the issue . . . have rejected [Appointments Clause challenges] where claimant failed to make the constitutional challenge at the administrative level"). Thus, case law supports the undersigned's conclusion that a challenge under the Appointments Clause must be presented in a timely manner. *See Ryder v. United States*, 515 U.S. 177, 182-83 (1995) (concluding that petitioner who timely challenged composition of the trial court was entitled to a hearing before properly appointed panel); *see also Lucia*, 138 S. Ct. at 2055 ("This Court has held that one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates his case is entitled to relief.") (quoting *Ryder*, 515 U.S. at 182-83). A "timely" challenge in this context is one that is made during the pendency of the administrative proceedings where the alleged constitutional violation is purportedly occurring. *Perez*, 2019 WL 1405642, at *4.

[5] In reaching this conclusion, the undersigned need not determine whether SSA ALJs are "Officers of the United States" subject to the Appointments Clause. The undersigned notes, however, that Appointments Clause challenges to SSA ALJs have been mitigated by the Commissioner's July 16, 2018 Ruling, in which the Acting Commissioner ratified the appointment of all SSA ALJs and approved those appointments as her own. SSR 19-1p; *see also* Social Security Ruling 19-1p; Titles II and XVI: Effect of the Decision in *Lucia v. Securities and Exchange Commission (SEC)* on Cases Pending at the Appeals Council, 84 FR 9582-02, 2019 WL 1203026 (Mar. 15, 2019). SSR 19-1p notwithstanding, Plaintiff is correct that this subsequent ratification of the appointment of SSA ALJs does not affect her case, as the Ruling does not apply retroactively. *See generally* (ECF No. 32 at 10-11).

Here, it is undisputed that Plaintiff did not challenge the validity of the ALJ's ability to hear her case in the administrative proceedings below. Thus, Plaintiff's current challenge to the appointment of the ALJ is belated. *But see Bizarre v. Berryhill*, 364 F. Supp. 3d 418 (M.D. Pa. Mar. 4, 2019) (finding claimant did not need to raise Appointments Clause challenge at the administrative level); *Bradshaw v. Berryhill*, No. 5:18-CV-00100-RN, 2019 WL1510953, at *1 (E.D.N.C. Mar. 22, 2019) (same); *Culclasure v. Comm'r of Soc. Sec. Admin.*, 375 F. Supp. 3d 559, 574 (E.D. Pa. 2019) (same).

In her Reply, Plaintiff argues that because *Lucia* postdated all administrative proceedings except for the Appeals Council's denial of review, "it would be unreasonable to expect and require the Plaintiff to submit additional arguments for its consideration." (ECF No. 32 at 5). The undersigned finds this argument unpersuasive. Long before *Lucia*, well-settled case law required that Appointments Clause challenges be made timely. *Muhammad v. Berryhill*, 381 F. Supp. 3d 462, 469 (E.D. Pa. 2019) (finding that although claimant's case was not "frivolous or disingenuous," there was nothing "rare" that would excuse claimant's failure to raise the Appointments Clause challenge at the administrative level). Indeed, in *Ryder v. United States*, the Supreme Court noted that "one who makes a timely challenge to the constitutional validity of the appointment of an officer who adjudicates [her] case is entitled to a decision on the merits . . . . Any other rule would create a disincentive to raise Appointments Clause challenges with respect to questionable judicial appointments." *Ryder*, 515 U.S. at 182-83. Moreover, "regularly permitting unsuccessful claimants to raise [Appointments Clause] challenges for the first time on judicial review would encourage the practice of 'sandbagging:" suggesting or permitting, for strategic reasons, that the [adjudicative entity] pursue a certain course, and later—if the outcome is unfavorable—claiming that the course followed was reversible error." *Muhammad*, 381 F.

Supp. 3d 462, 469-70 (quoting *Freytag v. Comm'r*, 501 U.S. 868, 895 (1991)); *see also Gutierrez v. Berryhill*, No. CV-17-129-GF-BMM, 2019 WL 2240602, at *4 (D. Mont. May 24, 2019) (concluding that failure to raise an Appointments Clause objection during claimant's administrative proceedings precludes claimant from raising the issue on judicial review).

Lastly, Plaintiff argues that, even if she failed to raise an Appointments Clause challenge at the administrative level, the Court should nonetheless exercise its discretion and consider the challenge in this appeal. *See generally* (ECF No. 32 at 6-9). In the absence of circumstances to warrant such "rare" relief, however, the undersigned declines Plaintiff's invitation. *See Freytag*, 501 U.S. at 879 (concluding that claimant's case was "one of those rare cases" in which the Court should exercise discretion to hear petitioners' challenge to the constitutional authority of the trial judge).

Having rejected Plaintiff's Appointments Clause challenge, the undersigned next addresses the Motion for Summary Judgment on the merits.

**B. The ALJ Properly Evaluated Plaintiff's Testimony**

Plaintiff argues that the ALJ improperly discounted her testimony about the severity of her symptoms, including her physical symptoms, allegations of pain, and limitations caused by her mental health condition. *See* (ECF No. 33 at 6-12).

In considering a claimant's symptoms, the ALJ must follow a two-step process: "Step one is to determine whether the individual has a medically determinable impairment that could reasonably be expected to produce the alleged symptoms." *Contreras-Zambrano v. Soc. Sec. Admin., Comm'r,* No. 17-12447, 2018 WL 618420, at *3 (11th Cir. Jan. 30, 2018) (citing SSR 16-3p, 82 Fed. Reg. 49,463-64 (Oct. 25, 2017)). "Step two is to evaluate the intensity and persistence of an individual's symptoms, such as pain, and determine the extent to which an individual's

symptoms limit her ability to perform work-related activities." *Id.* (citing SSR 16-3p, 82 Fed. Reg. at 49, 464-66). An ALJ considers "whether there are any inconsistencies in the evidence and the extent to which there are any conflicts between [a claimant's] statements and the rest of the evidence, including [claimant's] history, the signs and laboratory findings, and statements by [the claimant's] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. § 416.929(c)(4).

Here, the ALJ concluded that Plaintiff's medically determinable impairments could reasonably be expected to cause her alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence, and limiting effects of her symptoms were "not entirely consistent with the medical evidence and other evidence in the record." (R. 18). The ALJ articulated several reasons for discrediting Plaintiff's testimony.

First, the ALJ explained that Claimant's allegations about the limiting effects of her symptoms were "out of proportion with the overall evidence of record." (R. 19). In this regard, the ALJ noted that "while [C]laimant proclaimed in her Function Report [Exhibit 6E] that she could not cook, perform household chores, or drive, [at other times] in the record Claimant reported she was able to do a lot of laundry during the week and was able to drive, attend doctor appointments, and go to the supermarket." *Id.* Although Plaintiff argues that the ALJ misrepresents the record regarding Plaintiff's activities of daily living (like cooking, driving and doing laundry), *see* (ECF No. 33 at 6-7), the ALJ questioned Plaintiff during the administrative hearing about inconsistencies between her testimony and Function Reports, on the one hand, and medical records from treating sources, including physical therapy records, on the other. C*ompare, e.g.,* (R. 85 and 86) (Plaintiff's testimony that her sister does the laundry and her denial that she told physical therapist that claimant does laundry) *with* (R. 435) (Plaintiff's report to physical

therapist that "she does do a lot of laundry throughout the week"). As well, the ALJ noted an inconsistency between Claimant's assertion that she suffered from back pain 24 hours a day, seven days a week, with evidence showing that, despite an alleged onset date of January 2008, Plaintiff worked as a substitute teacher through 2012. (R. 19); *see also* (R. 94, 197). The ALJ found that the fact Plaintiff was able to work for years after her alleged onset date "make[s] the claimant's contention that she is currently unable to work because of her constant . . . pain, less persuasive." (R. 19).

Additionally, the ALJ found that Plaintiff's allegations of debilitating back pain were contradicted by treatment records from Dr. Issa.[6] *Id*. In this regard, the ALJ noted that Plaintiff presented to Dr. Issa for treatment of back pain only two times (on July 15, 2015 and June 28, 2016). *Id*. As well, Dr. Issa's treatment notes reflect that Claimant visited mostly for medication refills, follow-ups, or for treatment of conditions unrelated to her allegedly disabling impairments. *Id.*; *see generally* Exhibits 5F and 15F (Dr. Issa's treatment notes). The ALJ also found no evidence in the record to support Plaintiff's testimony that her doctor suggested she have back surgery. (R. 19). Further, the ALJ explained that Plaintiff's treatment was "essentially conservative and/or routine in nature," which "negates claimant's allegations that her symptoms are of the intensity, persistence, and limiting effects to be disabling." *Id*. In particular, the ALJ noted that: (i) "Dr. Issa only prescribed the claimant medications as treatment for her allegedly disabling physical and mental conditions and did not recommend that the claimant pursue [other] treatment" or obtain an updated MRI;[7] (ii) the medications were "adequately effective at relieving [Claimant's] symptoms and [Claimant] did not request a different medication or . . . dosage;" and

---

[6] Dr. Issa treated Plaintiff from June 2014 to February 2017. (R. 379); *see also* Exhibits 5F and 15F.

[7] The only MRI on record is dated October 5, 2012. (R. 389-91).

(iii) despite Claimant's testimony that the medications caused tiredness, constipation, and nausea, she failed to report any adverse side effects from the medications. (R. 19-20).

The ALJ also noted Plaintiff's non-compliance with treatment as another reason to discount Plaintiff's allegations of debilitating mental health symptoms. (R. 20). For example, the ALJ noted that, in 2012, Plaintiff reported to her mental health providers that "she never remained compliant on psychotropic medications for more than one month." (R. 20); *see also* (R. 307). In addition, in January 2013, Plaintiff ignored her therapist's direction to take anti-depressant medication for up to six weeks to ensure its effectiveness, and instead took the medication for only three weeks. (R. 20, 313). Then, in February 2013, Plaintiff reported to her therapist that "she was taking more of her pain medications than she was supposed to . . . ." (R. 20, 313). Plaintiff was similarly noncompliant with treatment for her physical ailments. The ALJ noted that: (i) although Plaintiff was referred to a neurologist for back pain, there is no evidence that she sought such treatment; (ii) Plaintiff has not sought to see a specialist for back surgery, despite her testimony that her doctors had recommended surgery; and (iii) although aware of the importance of timely arrival to therapy, Plaintiff's progress was limited because of her inability to arrive on time. (R. 20).

These inconsistencies provide sufficient grounds to support the ALJ's credibility determination. *See, e.g., Vason v. Astrue*, No. 2:09-CV-912-TFM, 2010 WL 2629444, at *5 (M.D. Ala. June 30, 2010) (concluding that ALJ did not err in discrediting claimant's testimony where conflicts existed within her testimony and between her testimony and the record). Because credibility determinations are the province of the ALJ, a clearly articulated credibility finding with substantial supporting record evidence will not be disturbed. *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005); *Foote v. Chater*, 67 F.3d 1553, 1562 (11th Cir. 1995); *May v. Comm'r of*

*Soc. Sec. Admin.*, 226 F. App'x 955, 958 (11th Cir. 2007) (noting that the ALJ provided sufficiently explicit and adequate to reasons to partially discredit claimant); *see also Dyer v. Barnhart*, 395 F.3d 1206, 1212 (11th Cir. 2005) (reversing where the district court improperly reweighed the evidence and failed to give substantial deference to ALJs decision, which had concluded that claimant's subjective complaints were inconsistent with the testimony and the medical record).

Moreover, notwithstanding Plaintiff's arguments to the contrary, the undersigned finds that substantial evidence supports the ALJ's assessment of Plaintiff's mental health. Here, the ALJ found that Claimant was "moderately" limited in her ability to interact with others and in her concentration, persistence, and pace. (R. 14-15). In reaching this conclusion, the ALJ noted that during mental health examinations, Plaintiff's treating psychiatrist (Dr. Barnett) repeatedly found Plaintiff to be cooperative, alert, and not confused or distractible. *Id.*; *see also* Exhibit 14F (Dr. Barnett's treatment records). The ALJ also noted that on most days, Plaintiff spent six hours watching movies, which the ALJ found inconsistent with an inability to concentrate and persist for two-hour increments. (R. 15).

Against this backdrop, the undersigned finds that the ALJ applied the proper legal standards in considering Plaintiff's allegations about her impairments, assessing Plaintiff's testimony in the context of all the evidence, and articulating legitimate reasons for discounting Plaintiff's testimony. *Allen v. Sullivan*, 880 F.2d 1200, 1203 (11th Cir. 1989) (finding no merit to plaintiff's argument where the ALJ articulated various reasons for rejecting appellant's subjective complaints of pain that did not coincide with reports to psychologist). Thus, the ALJ's determination should not be disturbed. *See generally Carson*, 440 F. App'x at 864; *Pettaway v. Astrue*, 376 F. App'x 889, 891 (11th Cir. 2010) (finding no reversible error where ALJ provided specific reasons for discrediting claimant's testimony); *see also Dyer*, 395 F.3d at 1212 (finding

reversible error where court disturbed an ALJ's adequately explained determination regarding claimant's subjective complaints).

**C. The ALJ Properly Weighed the Medical Opinions**

Plaintiff next challenges the ALJ's assessment of the medical opinions. (ECF No. 33 at 12-15). More specifically, Plaintiff argues that the ALJ erred in giving "little weight" to her treating sources, while affording "considerable" and "great" weight to the opinions of the State Agency consultants. (ECF No. 33 at 12).

Social Security regulations require the ALJ to consider and evaluate every medical opinion received in determining whether a claimant is disabled. *See* 20 C.F.R. § 416.927(c) ("Regardless of its source, we will evaluate every medical opinion we receive."). Medical opinions are "statements from acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [the claimant's] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 C.F.R. § 416.927(a)(1).

In weighing medical opinions, an ALJ is required to consider certain factors, including: (i) whether the claimant has an examining or treating relationship with the medical source; (ii) the medical source's area of specialization; (iii) whether the medical source's opinion is well-supported; and (iv) whether the opinion is consistent with the record. *See* 20 C.F.R. § 416.927(c). Moreover, an ALJ must generally give controlling weight to the opinion of a treating source about the nature and severity of a claimant's impairments if it "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2). When an ALJ does not give controlling

weight to a treating source's opinion, the ALJ must "clearly articulate" good cause for discounting it.[8] *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1240-41).

*1. The ALJ Properly Assessed the Opinion of Plaintiff's Psychiatrist – Dr. Barnett*

Plaintiff argues that the ALJ erred in giving Dr. Barnett's opinion "little weight." (ECF No. 33 at 12-14). Dr. Barnett saw Plaintiff approximately nine times between May 2014 and March 2017. (R. 397). On March 17, 2017, Dr. Barnett completed a Mental Capacities Evaluation (Exhibit 10F) (the "MCE"). (R. 392-405). In the MCE, Dr. Barnett opined that Plaintiff had a "marked"[9] limitations in: (i) maintaining social functions; (ii) concentration, persistence, or pace; (iii) repeated episodes of deterioration or decompensation in work or work-like settings; (iv) understanding, carrying out, and remembering simple instructions; (v) performing simple tasks on a full time basis; (vi) independently performing routine repetitive tasks; (vii) sustaining attention and concentration to tasks; (viii) using judgment; (ix) achieving quantity and quality goals and responding to time limits; (x) performing work requiring regular contact with others; (xi) relating and responding appropriately to supervisors, co-workers and the public; (xii) maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; (xiii) responding appropriately to usual work situations, changes in a routine work situation, and to the stress of customary work pressures in a work environment; (xiv) making simple work-related decisions; performing activities within a schedule, including maintaining regular attendance and being punctual within customary tolerances; (xv) completing a normal

---

[8] "Good cause exists 'when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records.'" *Winschel*, 631 F.3d at 1179 (quoting *Phillips*, 357 F.3d at 1241).

[9] "Marked" is defined as "[a]n extreme level of impairment or limitation of ability to function that would preclude[] the patient from functioning at least 50% of an 8-hour workday." (R. 392).

workday and workweek without interruptions from psychologically based symptoms and performing at a consistent pace. (R. 20-21, 393-96). Dr. Barnett also opined that Plaintiff had "poor"[10] ability in activities of daily living. (R. 20, 393). Dr. Barnett concluded that:

> [Plaintiff's] ability to function is severely impaired due to her psychiatric condition. She suffers from depression, anxiety, and borderline personality disorder. She has also been diagnosed with Attention Deficit Hyperactivity Disorder. Although she has a college degree, all her attempts at work have failed due to the above psychiatric problems.

(R. 398); *see also* (R. 460) (Dr. Barnett's 6/30/16 one-line letter asserting that Plaintiff was "unable to work as a result of her psychiatric condition.").

The ALJ discounted Dr. Barnett's disabling opinion for several reasons. For example, the ALJ found that the doctor's opinion was "inconsistent with the totality of the evidence." (R. 21). In this regard, the ALJ noted that Dr. Barnett's opinion was inconsistent with his own treatment notes, which reflected "that on mental status examinations[,] the claimant was fully oriented to all spheres and had normal, goal directed thoughts, normal thought content, and usually had appropriate affect and was not distractible." *Id.*; *see also* Exhibit 14F. Treatment notes also reflected that Plaintiff had "good" or "satisfactory" judgment and her attitude was "cooperative." (R. 466, 485-89). The ALJ also found Dr. Barnett's statement that Claimant did not abuse substances to be internally inconsistent with his progress note reflecting that Plaintiff was taking an "excessive amount of medications, particularly with benzodiazepines." (R. 23); *see also* (R. 475) (doctor's undated progress note).

---

[10] "Poor" is defined as "an impairment that precludes patient from satisfactorily performing this activity independently, appropriately, effectively, and on a sustained basis in a regular work setting for at least 25% of an 8-hour workday." (R. 392). "Sustained," in turn, is defined as "40 hours per week less a reasonable time for lunch and breaks – [considering] the effects, if any, of pain and/or prescribed medication." *Id.*

Second, in addition to internal inconsistencies, the ALJ found Dr. Barnett's conclusion regarding Plaintiff's limitations to be inconsistent with Dr. Issa's treatment records. For example, the ALJ found Dr. Barnett's statement that Plaintiff "does not abuse substances" to be inconsistent with Dr. Issa's progress notes that Plaintiff had "barbiturate and similar acting sedative or hypnotic dependence[,] continuous." (R. 23); *compare* (R. 405) (Dr. Barnett's MCE) *with* (R. 344) (12/23/2014 note of physician's assistant recording Plaintiff's drug use as "frequent use of prescription narcotics, daily use."). As well, the ALJ found that Dr. Barnett's disabling opinion was inconsistent with Dr. Issa's progress notes that reflect Plaintiff was typically "alert, fully oriented to all spheres, and in no acute distress." (R. 21); *see also* Exhibits 5F and 15F.

Third, the ALJ discounted Dr. Barnett's opinion because it was largely based on Plaintiff's subjective complaints and self-reports. (R. 21). As the ALJ explained, Dr. Barnett's mental status examinations lacked objective evidence to support his opinion, "such as documentation that the claimant had any cognitive deficits." *Id*. For example, in the MCE, when asked to "describe all relevant clinical findings," Dr. Barnett based his response on "claimant's feelings of guilt and worthlessness, along with a depressed and hopeless mood" rather than on objective findings. (R. 21, 396); *see e.g., Hughes v. Comm'r of Soc. Sec. Admin.*, 486 F. App'x 11, 13-14 (11th Cir. 2012) (finding that ALJ had good cause to discount opinions of physician because they cited to no specific objective medical evidence or test results nor referenced supportive physical or mental evaluations); *Pettaway*, 376 F. App'x at 891 (finding that ALJ had good cause to discount opinion that went against balance of objective medical evidence and was based mainly on claimant's subjective complaints).

Against this legal and factual backdrop, the undersigned finds that the ALJ "clearly articulated" "good cause" for discounting Dr. Barnett's treating source opinion. *Winschel*, 631

F.3d at 1179 (quoting *Lewis*, 125 F.3d at 1440). Moreover, the ALJ's Decision is supported by substantial evidence. *See, e.g.*, *Crawford*, 363 F.3d at 1158 (concluding that ALJ could properly discount physician's opinion that claimant was disabled where it was inconsistent with treatment notes showing "no acute distress" and no musculoskeletal abnormalities); *Carpenter v. Comm'r of Soc. Sec.*, 614 F. App'x 482, 489 (11th Cir. 2015) (finding ALJ had good cause to reject treating physician's opinion of extreme limitations where examinations were generally unremarkable and treatment methods were conservative and effective); *Vesy v. Astrue*, 353 F. App'x 219, 223 (11th Cir. 2009) (discounting treating physician's opinion when treatment notes did not suggest claimant was as limited as doctor opined).

*2. The ALJ Properly Assessed the Opinion of Plaintiff's General Practitioner – Dr. Issa*

Plaintiff also argues that the ALJ erred in giving "little weight" to the opinion of Dr. Issa, who treated Plaintiff's physical impairments. (ECF No. 33 at 14-15). Dr. Issa treated Plaintiff between June 2014 and February 2017 on a monthly basis. (R. 379); *see also* Exhibits 5F and 15F. On March 16, 2017, Dr. Issa completed a questionnaire and a Physical Capacities Evaluation (together, the "PCE"). *See* (R. 379-87) (Exhibit 9F). In the PCE, Dr. Issa diagnosed Plaintiff with the following conditions: attention-deficit hyperactivity disorder unspecified type; anxiety disorder unspecified; hypothyroidism unspecified; and morbid obesity due to excess calories. (R. 379, 381). Dr. Issa concluded that Plaintiff could not perform sedentary work on a sustained basis due to "chronic back pain [which] impedes the patient from daily work routine." (R. 383). Without explanation, in the section reserved for additional comments, Dr. Issa wrote "degenerative disc disease." (R. 384). Furthermore, Dr. Issa opined that Plaintiff could: (i) sit, stand, and/or walk less than one hour in an 8-hour workday; (ii) never lift on a regular and sustained basis; (iii) not use her hands to repetitively push and pull arm controls or to perform fine manipulation;

and (iv) not use her feet for repetitive movement (as in pushing and pulling of leg controls) on a regular or sustained basis. (R. 24-25, 385-86). Lastly, Dr. Issa opined that Plaintiff would need to lie down and rest during an 8-hour workday and would have to elevate her legs 80 percent of the time if performing sedentary work. (R. 25, 387).

The ALJ gave Dr. Issa's PCE "little weight" for several reasons. For example, the ALJ concluded that Dr. Issa's opinion was "inconsistent with the totality of the evidence." (R. 25). In this regard, the ALJ found that Dr. Issa's disabling opinion in the PCE was contrary to his own progress notes, which reflected mostly normal physical examinations that did not support extreme limitations. *Id*. As the ALJ noted, Dr. Issa never restricted Plaintiff's ability to perform any activities, and "continually reported that on general examinations[,] the [C]laimant was not in acute distress, was alert and oriented, and did not have any neurological deficits." *Id*. Accordingly, the ALJ concluded that Dr. Issa "did not provide any objective evidence to explain the basis for his over-restrictive limitations/opinions either in the March 2017 opinions themselves, or in his progress notes." *Id*. Moreover, although Dr. Issa opined that Plaintiff had moderate weakness or fatigue, the ALJ reflected that treatment notes consistently reported that Plaintiff denied fatigue and lack of energy. (R. 26). In addition, although Dr. Issa's progress notes do not discuss serious medication side effects, the PCE asserts that Plaintiff's medications may have severe side effects that could "limit the patient's effectiveness due to distraction, inattention, drowsiness, etc." (R. 26, 381).

Moreover, Dr. Issa's PCE was inconsistent with other medical evidence of record. For example, in September 2016, Dr. Eugene Antelis (Plaintiff's physical therapist for carpal tunnel) evaluated Plaintiff and found that she was not in acute distress and had no deficiencies in her

musculoskeletal range of motion. (R. 25, 458). According to Dr. Antelis, Plaintiff had normal range of motion and 5/5 bilateral muscle strength in her upper and lower extremities. (R. 25, 458).

Next, the ALJ noted that, although Dr. Issa had not diagnosed Plaintiff with any specific back condition during treatment, the PCE referred to "degenerative disc disease." (R. 26). As well, the ALJ found that "Dr. Issa's continued prescriptions of strong narcotic pain medications and prescription strength muscle relaxer are inconsistent with his physical examinations that were within normal limits." (R. 27).

After setting forth her reasons, the ALJ concluded that Dr. Issa's opinion was "not grounded in the objective record and [includes] limitations for impairments that are not found to be severe," and thus gave "little weight" to the opinion. *Id*. Based on this record, the undersigned finds no error in the ALJ's Decision. As with Dr. Barnett's opinion, the ALJ applied the proper legal standards and clearly articulated good cause for discounting Dr. Issa's PCE. *Winschel*, 631 F.3d at 1179 (quoting *Lewis*, 125 F.3d at 1440) (ALJ must "clearly articulate" "good cause" for discounting a treating source opinion). Moreover, the ALJ's Decision is supported by substantial evidence. *See, e.g.*, *Crawford*, 363 F.3d at 1158; *Carpenter*, 614 F. App'x at 489; *Vesy*, 353 F. App'x at 223.

*3. The ALJ Properly Weighed the Opinions of the State Agency Consultants – Drs. Mihm, Laboy, and Mungul*

Although Plaintiff makes only passing reference to the ALJ's purported error in assigning "considerable" and "great" weight to the opinions of the State Agency consultants (Drs. Mihm, Laboy, and Mungul), the undersigned finds that the ALJ applied the correct legal standards and her decision is supported by substantial evidence. *See* (ECF No. 33 at 7, 12-13).

*a. State Agency Psychological Consultants*

Dr. Mihm reviewed Plaintiff's medical records and completed a Mental Residual Functional Capacity ("MRFC") assessment at the initial level. (R. 23). In relevant part, Dr. Mihm opined that Plaintiff had only "moderate" limitations in her ability to: (i) understand and remember detailed instructions, and could remember simple and most complex instructions; (ii) carry out detailed instructions; (iii) maintain attention and concentration for extended periods; (iv) interact with the general public; (vi) accept instructions and respond appropriately to criticism from supervisors; and (vii) respond appropriately to changes in the work place. (R. 108-09).

In all other areas, Dr. Mihm found that Plaintiff was "not significantly limited." (R. 108-09). In particular, Dr. Mihm found that Plaintiff was not significantly limited in her ability to: (i) complete a normal workday and "complete some simple and some complex tasks and . . . maintain [concentration] throughout the workday with ordinary supervision; and (ii) maintain socially appropriate behavior and . . . relate to others in a work place on a superficial level, performing best in a setting that does not require extensive social interaction (due to reported social withdrawal). (R. 24, 109).

On reconsideration, Dr. Laboy concurred with Dr. Mihm's MRFC. (R. 24); *compare* (R. 108-10) *with* (R. 122-24). Moreover, both doctors concluded that the Claimant's allegations were "at best partially credible as the severity of [Claimant's] symptoms and limitations were not supported by the objective evidence in the file." (R. 24); *see also (*R. 105, 119). Instead, they opined that Claimant's primary issues appeared to relate to prescription drug abuse. (R. 24); *see also* (R. 105, 119).

The ALJ gave these opinions "considerable weight" (as opposed to "great weight"), noting an internal inconsistency in these opinions between Plaintiff's purported ability to remember "most

complex" instructions and complete "some complex" tasks, on the one hand, and Claimant's moderate limitations in concentration, persistence, or pace, on the other. (R. 24). Accordingly, the ALJ's RFC determination for mental work-related activities was more restrictive than the State Agency consultants' opinion.

The undersigned finds no error in the ALJ's assigning "considerable weight" to the State Agency reviewers. The ALJ reviewed the record, articulated her reasons, and substantial evidence supports her decision. Moreover, State Agency consultants are considered experts in Social Security disability programs and their opinions may be entitled to great weight when, as here, the opinions are supported by the evidence in the record. *See* SSR 96-6p, 1996 WL 374180, *3. The more consistent the opinion of a non-examining doctor is with the record, the more weight the ALJ may assign to that opinion. *See* 20 C.F.R. § 416.927(c)(4).

*b. State Agency Physical Consultant*

Dr. Mungul reviewed Plaintiff's medical records and completed a Physical Residual Functional Capacity ("PRFC") assessment at the reconsideration level. (R. 23). In relevant part, Dr. Mungul opined that Plaintiff could perform light exertional level work, including: (i) unlimited balancing; (ii) frequent climbing of ramps, stairs, ladders, ropes or scaffolds; (iii) frequent kneeling, crouching, or crawling; and (iv) occasional stooping. (R. 27, 121).

The ALJ also concluded that Dr. Mungul's opinion was "predicated on the evidence of record, including careful consideration of the claimant's doctors' opinions and the claimant's allegations about her symptoms and limitations," including the 2012 lumbar and cervical spine MRI. (R. 27). The ALJ afforded Dr. Mungul's opinion "great weight." *Id*. Because Dr. Mungul's opinion is consistent with the record before the undersigned, the ALJ did not err.

In sum, the ALJ did not err in assigning "considerable" and "great" weight, respectively, to the State Agency consultants and in relying on their opinions, when as here, the underlying opinions are supported by the record. Moreover, as is clear from the ALJ's Decision, the ALJ independently and carefully reviewed the record to determine Plaintiff's RFC. *See, Ogranaja v. Comm'r of Soc. Sec.*, 186 F. App'x 848, 851 (11th Cir. 2006) (holding that substantial evidence supported the ALJ's decision to assign great weight to non-examining physicians' opinions that "were supported by and consistent with the record as a whole"); *see also T.R.C. v. Comm'r of Soc. Sec. Admin.*, 553 F. App'x 914, 917-18 (11th Cir. 2014) (concluding that the ALJ properly gave substantial weight to the opinion of a non-examining source because the doctor provided supporting explanation for opinion and it was supported by the record); *Key v. Comm'r of Soc. Sec.*, No. 5:12-CV-415-OC-18PRL, 2013 WL 4774768, at *7, *9 (M.D. Fla. Sept. 4, 2013) (finding no error in the ALJ's reliance on the testimony of a non-examining medical expert who reviewed the entire record and opined on claimant's limitations); *Forsyth v. Comm'r of Soc. Sec.*, 503 F. App'x 892, 893 (11th Cir. 2013) (affirming the ALJ's decision to give more weight to the opinion of non-examining doctor than to that of a treating source); *Jarrett v. Comm'r of Soc. Sec.*, 422 F. App'x 869, 873-74 (11th Cir. 2011) (holding that the ALJ did not err in relying on the reports of non-examining physicians "because their opinions were supported by the record"). Ultimately, it is the ALJ's duty to weigh the medical evidence. *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. 2008). Here, the ALJ properly weighed the medical opinions, applied the proper legal standards, and the ALJ's determination is supported by substantial evidence.

**D. The ALJ Properly Relied on the Vocational Expert's Testimony**

Lastly, Plaintiff argues that the ALJ improperly relied on the testimony of the Vocational Expert in finding that Plaintiff could work as an electronics worker, small products assembler, or

mail sorter. (ECF No. 33 at 15-17); *see also* (R. 29, 88). Specifically, Plaintiff complains that there was no explanation given by the ALJ or the Vocational Expert of how Plaintiff "would be capable of maintaining competitive employment in such positions." (ECF No. 33 at 16-7).

Plaintiff's argument lacks merit. First, Plaintiff's reliance on *Vidal v. Harris*, 637 F.2d 710 (9th Cir. 1981), is misplaced. *Vidal* is not only non-binding on this Court, but is also inapposite to the facts of this case.[11] Second, the ALJ thoroughly reviewed the medical evidence of Plaintiff's mental and physical impairments and included all resulting limitations in the hypothetical to the Vocational Expert. (R. 88). Thus, Plaintiff's argument that the "combination of impairments" would restrict her ability to maintain employment rings hollow. Lastly, unlike the requirement that an ALJ identify, explain, and resolve any apparent conflicts between an expert's testimony and DOT job descriptions, *see, e.g.*, SSR 00-4p, Plaintiff provides no support for her conclusory argument that the ALJ was required to seek further explanation from the Vocational Expert in this case. Consequently, the undersigned finds no error in the ALJ's reliance on the Vocational Expert's testimony to conclude that Plaintiff could "successfully adjust to other work that exists in significant numbers in the national economy." (R. 30).

## VI. RECOMMENDATION

For the reasons set forth above, the undersigned respectfully **RECOMMENDS** that: (i) Defendant's Motion for Summary Judgment (ECF No. 23) be **GRANTED**; (ii) Plaintiff's Motion to Declare Social Security Administration Administrative Law Judges Unconstitutional as

[11] The *Vidal* court concluded that the record did not contain sufficient evidence to support a finding that claimant was qualified for other jobs in the national economy. *Vidal*, 637 F.2d at 713. In that case, the vocational expert had stated that "claimant would require considerable more training than a person of average learning ability," but failed to provide evidence on whether employers would find the requisite training to be reasonable. *Id*. Notably, the claimant in *Vidal* was also without counsel and the Ninth Circuit found that the ALJ had failed to adequately examine the expert. *Id.* The instant case has none of those facts.

Violating the Appointments Clause and Remand for New Administrative Hearing (ECF No. 30) be **DENIED**; and (iii) the ALJ's Decision be **AFFIRMED**.

Within **fourteen (14)** days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to any of the above findings and recommendations as provided by the Local Rules for this district. 28 U.S.C. § 636(b)(1); S.D. Fla. Mag. J. R. 4(b). The parties are hereby notified that a failure to timely object waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions contained in this Report and Recommendation. 11th Cir. R. 3–1 (2019); *see Thomas v. Arn*, 474 U.S. 140 (1985).

**DONE AND ORDERED** at Chambers, in Fort Lauderdale, Florida, on January 17, 2020.

ALICIA O. VALLE
UNITED STATES MAGISTRATE JUDGE

cc: U.S. District Judge Beth Bloom
All Counsel of Record